## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JEREMY SMITH, Derivatively on Behalf of Nominal Defendant BIOXCEL THERAPEUTICS, INC., | ) ) ) | |
| | ) | Case No. _____ |
| Plaintiff, | ) ) | |
| | ) | JURY TRIAL DEMANDED |
| v. | ) ) | |
| VIMEL MEHTA, PETER MUELLER, JUNE BRAY, SANDEEP LAUMAS, MICHAEL MILLER, MICHAL VOTRUBA, RICHARD I. STEINHART, ROBERT RISINGER, and KRISHNAN NANDABALAN, | ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| BIOXCEL THERAPEUTICS, INC., | ) ) | |
| Nominal Defendant. | ) | |

### <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Jeremy Smith ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant BioXcel Therapeutics, Inc. ("BioXcel" or the "Company"), against certain current and former executive officers and members of the Company's Board of Directors (the "Board") for breaches of fiduciary duties, unjust enrichment, waste of corporate assets, and violations of Sections 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, United States Securities and Exchange

1

Commission ("SEC") filings, press releases published by and regarding BioXcel, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of BioXcel against certain current and former officers and members of the Company's Board (collectively, the "Individual Defendants") (defined below) for, among other things, breaching their fiduciary duties to the Company and its stockholders by intentionally or recklessly making or permitting the dissemination of materially false and misleading statements and omissions from December 7, 2022 through the present (the "Relevant Period") regarding, among other things, the true nature of the Company's clinical trials, financial health and outlook, and adequacy of its internal controls.

2.      BioXcel is a clinical stage biopharmaceutical company focused on finding new therapeutic uses for pre-existing chemicals that it identifies through the use of artificial intelligence ("AI"). The Company purports to "leverage[] existing approved drugs and/or clinically evaluated product candidates together with big data and proprietary machine learning algorithms to identify new therapeutic indications."

3.      The Company's sole commercially viable product, "IGALMI," comes from a newly discovered application for dexmedetomidine ("dex") labeled as BXCL501. BXCL501 compound is used to treat agitation in various patient populations. Prior to the start of the Relevant Period, the Company secured approval from the U.S. Food and Drug Administration ("FDA") to use BXCL501, branded as IGALMI, to treat agitation in patients with schizophrenia and bipolar disorders.

4.      In an effort to further commercialize BXCL501 and increase the product's

revenues, BioXcel focused on securing FDA approval for a new indication of BXCL501 as a treatment for agitation in patients with dementia and Alzheimer's Disease. In December 2021, the Company announced that it was embarking on Phase 3 clinical trials – called TRANQUILITY II and TRANQUILITY III – as the next steps in securing FDA approval for BXCL501 to treat agitation in these new patient populations.

5.      Meanwhile, to maintain financial viability, the Company secured financing from two private financial backers: Oaktree Capital Management, L.P. ("Oaktree") and Qatar Investment Authority ("QIA"). In a press release published on April 19, 2022, BioXcel disclosed that it had entered strategic financing agreements with Oaktree and QIA under which the funds would provide $260 million in gross funding to support the Company's commercial activities. The press release noted that full execution of this financing would result in cash runway into 2025 for the Company. The first $100 million of the financing was conditioned on FDA approval of BXCL501 for treatment associated with schizophrenia and bipolar disorders, which the Company had satisfied weeks earlier. Additional financing, however, was intended to support the expansion of clinical development efforts of BXCL501, including the "pivotal Phase 3 program for the acute treatment of agitation in patients with Alzheimer's Disease." The Company's future, therefore, relied heavily on the success of the TRANQUILTIY trials.

6.      Throughout the Relevant Period, the Company and its top executives repeatedly reiterated to investors that its TRANQUILITY II trial was "progressing well" and "on track." The Company's Chief Medical Officer ("CMO") and, according to the FDA, "Study Chair" of TRANQUILITY II, Robert Risinger ("Risinger"), stated on May 9, 2023: "We have very high confidence in demonstrating not only efficacy but also the safety in patients living in an assisted living or residential care setting."

3

7.      Despite the importance of these "pivotal" trials, BioXcel outsourced the TRANQUILITY trials to Segal Trials, a regional operation based in South Florida. The principal investigator assigned to oversee the trials – Dr. Caitlin Meyer ("Dr. Meyer") – was inexperienced, having never run a clinical trial before. The decision to engage Segal Trials and Dr. Meyer surprised and concerned BioXcel employees who recognized the trials' critical importance to the Company's future.

8.      From December 5, 2022, to December 21, 2022, the FDA conducted a site inspection of Dr. Meyer's North Miami facility and the TRANQUILITY II study. Typically, in studies such as this where a new drug application is not pending or close to submission, such FDA site-visits are triggered by an unusual event, such as concerns about data integrity raised by a whistleblower. When serious areas of concern are revealed, the FDA will issue a Form 483 letter detailing issues that must be remedied. As sponsor of the trial, BioXcel had the responsibility to ensure that the clinical trials complied with regulatory requirements to avoid the issuance of a Form 483 letter.

9.      Nonetheless, on December 21, 2022, following the North Miami facility investigation, Dr. Meyer received a Form 483 notification from the FDA (the "Form 483 Letter") outlining several observations of issues with the TRANQUILITY II clinical trial. The Form 483 Letter detailed, among other things, that the clinical trial was not being conducted in accordance with the approved protocol in certain instances, several patients did not have sufficient documentation showing that they met all inclusion criteria, at least one "Serious Adverse Event" occurred that was not timely reported to the medical monitor or safety team, and certain study participants did not sign a proper consent form, jeopardizing the study's participation rate.

10.     The Individual Defendants, however, did not disclose the FDA investigation or

4

Form 483 Letter *for over six months*, until revealing their existence on June 29, 2023. On an analyst call that day, the Individual Defendants admitted that they had known about the FDA investigation and Form 483 Letter since December 2022. Furthermore, the Individual Defendants disclosed that they discovered that Dr. Meyer had fabricated correspondence to the FDA in order to feign compliance with required protocols.

11.     On this news, the price of BioXcel common stock dropped 63.8%, or $11.28 per share, to close at $6.39 per share on June 29, 2023.

12.     Then, on August 14, 2023, the Company announced that management had "substantial doubt about the Company's ability to continue as a going concern for a period of at least 12 months." Chief Financial Officer ("CFO") Richard I. Steinhart ("Steinhart") stated that "the Company's previously disclosed cash runway projection assumed a full utilization of its strategic financing agreements of $155 million with Oaktree and QIA. Based on recent events, the Company is not likely to be in a position to meet the milestones to access the additional capital under the financing agreements."

13.     Further, BioXcel announced that it had paused the TRANQUILITY III clinical trial as the Company sought to meet with the FDA and to further discuss filing an application for a new indication of BXCL501. The Company's Chief Executive Officer ("CEO") Vimal Mehta ("Mehta") stated it had planned to meet with the FDA to discuss the "entire TRANQUILITY program," including the TRANQUILITY II clinical study and resulting "data audit."

14.     As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and misleading statements and omissions of material fact concerning BioXcel's clinical trial program and the Company's financial health to the investing public. Specifically, the Individual Defendants made

5

or caused the Company to make false and misleading statements, and omitted material facts, concerning the TRANQUILITY II study, the FDA investigation, the Form 483 Letter, and the Company's strategic financing. Despite knowing of the Form 483 Letter since at least December 2022, the Individual Defendants caused the Company to withhold this critical information from the investing public for over six months. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

16. To make matters worse, during the Relevant Period, while BioXcel's stock price was artificially inflated, and while in possession of material, adverse, non-public Company information, certain of the Individual Defendants sold significant amounts of their BioXcel stock.

17. As a result of the foregoing, a securities fraud class action was filed against the Company, CEO Mehta, CFO Steinhart, and CMO Risinger captioned *Martin v. BioXcel Therapeutics, Inc. et al.*, No. 3:23-cv-00915 (D. Conn.) (the "Securities Action"). The Securities Action has exposed the Company to massive class-wide liability.

18. In light of the Individual Defendant's misconduct—which has subjected the Company to the Securities Action, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend millions of dollars.

19. Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in

6

fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of BioXcel's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)) and Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9) promulgated thereunder by the SEC and Section 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

21.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

22.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

23.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

24.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Nominal Defendant BioXcel is incorporated in this District and conducts business in this District.

## PARTIES

*Plaintiff*

25.    Plaintiff is and has been a continuous shareholder of BioXcel common stock since April 2021.

*Nominal Defendant*

26.    Nominal Defendant BioXcel is incorporated under the laws of Delaware, with its principal executive offices located in New Haven, Connecticut. BioXcel's common stock trades on the Nasdaq Capital Market ("Nasdaq") under the ticker symbol "BTAI."

*Individual Defendants*

27.    Defendant Mehta co-founded the Company and has served as its CEO and President since May 2017. Defendant Mehta has served as a member of Board since April 2017. As set forth in the proxy statement filed by BioXcel with the SEC on May 17, 2023 (the "2023 Proxy Statement"), Mehta received $4,559,195 in compensation from the Company in 2022. According to the 2023 Proxy Statement, Mehta beneficially owned 962,722 shares of BioXcel's common stock as of April 27, 2023, representing 3.2% of all shares outstanding. During the Relevant Period, Mehta sold 191,000 shares of his personally held Company stock for proceeds of $3,824,179. Defendant Mehta is named as a defendant in the Securities Action.

28.    Defendant Peter Mueller ("Mueller") has served as Chairman of the Board since August 2017 and as a member of the Board since April 2017. Defendant Mueller also serves as Chairperson of the Compensation Committee and the Nominating and Corporate Governance Committee, and as a member of the Audit Committee. As set forth in the 2023 Proxy Statement, Mueller received $295,167 in compensation from the Company in 2022. According to the 2023 Proxy Statement, Mueller beneficially owned 465,194 shares of BioXcel's common stock as of

April 27, 2023, representing 1.6% of all shares outstanding.

29.     Defendant June Bray ("Bray") has served as a member of the Board since March 2021. Defendant Bray also serves as a member of the Board's Nominating and Corporate Governance Committee. As set forth in the 2023 Proxy Statement, Bray received $238,695 in compensation from the Company in 2022. According to the 2023 Proxy Statement, Bray beneficially owned 37,832 shares of BioXcel's common stock as of April 27, 2023.

30.     Defendant Sandeep Laumas ("Laumas") has served as a member of the Board since September 2017. Defendant Laumas also serves as Chairperson of the Board's Audit Committee, and as a member of the Compensation Committee and Nominating and Corporate Governance Committee. As set forth in the 2023 Proxy Statement, Laumas received $264,616 in compensation from the Company in 2022. According to the 2023 Proxy Statement, Laumas beneficially owned 190,388 shares of BioXcel's common stock as of April 27, 2023.

31.     Defendant Michael Miller ("Miller") has served as a member of the Board since June 2022. Defendant Miller also serves as a member of the Board's Audit Committee. As set forth in the 2023 Proxy Statement, Miller received $355,251 in compensation from the Company in 2022.

32.     Defendant Michal Votruba ("Votruba") has served as a member of the Board since March 2019. Defendant Votruba also serves as a member of the Board's Audit Committee. As set forth in the 2023 Proxy Statement, Votruba received $242,748 in compensation from the Company in 2022. According to the 2023 Proxy Statement, Votruba beneficially owned 250,575 shares of BioXcel's common stock as of April 27, 2023.

33.     Defendant Steinhart has served as the Company's CFO and Senior Vice President since March 2018, having previously served as Vice President and CFO from October 2017 to

March 2018. During the Relevant Period, Steinhart sold 7,084 shares of his personally held Company stock for proceeds of $176,502. Defendant Steinhart is named as a defendant in the Securities Action.

34.    Defendant Risinger has served as the Company's CMO since May 2021. Risinger also served as the Company's Senior Vice President of Clinical Development from December 2018 to May 2022. Defendant Risinger is listed by the FDA as the "Study Chair" for the TRANQUILITY II clinical trial. Defendant Risinger is named as a defendant in the Securities Action.

35.    Defendant Krishnan Nandabalan ("Nandabalan") is a co-founder of the Company. Defendant Nandabalan served as a member of the Board from May 2017 until September 19, 2023. From January 2020 until August 2022, Defendant Nandabalan also served as a consultant to the Company in the capacity of Chief Digital Officer. As set forth in the 2023 Proxy Statement, Nandabalan received $100,000 in compensation from the Company in 2022. According to the 2023 Proxy Statement, Nandabalan beneficially owned 8,850,438 shares of BioXcel's common stock as of April 27, 2023, representing 30.0% of all shares outstanding as of that date. During the Relevant Period, Nandabalan sold 180,000 shares of his personally held Company stock for proceeds of $3,260,076.

36.    Defendants referenced in paragraphs 27 through 35 are herein referred to as the "Individual Defendants."

37.    The Individual Defendants, together with BioXcel, are herein referred to as "Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

38.    By reason of their positions as officers and/or directors of BioXcel, and because of

their ability to control the business and corporate affairs of BioXcel, the Individual Defendants owed BioXcel and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage BioXcel in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of BioXcel and its shareholders so as to benefit all shareholders equally.

39.     Each director and officer of the Company owes to BioXcel and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

40.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of BioXcel, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

41.     To discharge their duties, the officers and directors of BioXcel were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

42.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of BioXcel, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the

11

Company.

43.     As senior executive officer and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

44.     To discharge their duties, the officers and directors of BioXcel were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of BioXcel were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to BioXcel's own Code of Business Conduct and Ethics and Corporate Governance Guidelines (together, the "Codes of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how BioXcel conducted its operations, and, upon

12

receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

   (d) establish and maintain systematic and accurate records and reports of the business and internal affairs of BioXcel and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

   (e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that BioXcel's operations would comply with all applicable laws and BioXcel's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

   (f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

   (g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

   (h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

  45. Each of the Individual Defendants further owed to BioXcel and the shareholders the duty of loyalty requiring that each favor BioXcel's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

46.     At all times relevant hereto, the Individual Defendants were the agents of each other and of BioXcel and were at all times acting within the course and scope of such agency.

47.     Because of their advisory, executive, managerial, and directorial positions with BioXcel, each of the Individual Defendants had access to adverse, non-public information about the Company.

48.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by BioXcel.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

49.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

50.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

51.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

52.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants,

who are directors of BioXcel, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

53.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

54.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Defendants and of BioXcel and at all times acted within the course and scope of such agency.

**BIOXCEL'S CODES OF CONDUCT**

55.     BioXcel maintains a Code of Business Conduct and Ethics ("Code of Ethics"), applying to all directors, officers and other employees, containing general guidelines for how members of the Company should conduct themselves "consistent with the highest standards of business ethics."

56.     All employees and directors have a duty to report any known or suspected violation of the Code of Ethics, including violations of the laws, rules, regulations or policies that apply to the Company. Employees or directors who violate the Code of Ethics are subject to appropriate discipline which may include, for an employee, termination of employment or, for a director, a request that such director resign from the Board.

57.     In a section titled "Competition and Fair Dealing," the Code of Ethics provides:

All employees should endeavor to deal fairly with fellow employees and with the Company's collaborators, licensors, customers, suppliers and competitors.

Employees should not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice. Employees should maintain and protect any intellectual property licensed from licensors with the same care as they employ with regard to Company-developed intellectual property. Employees should also handle the nonpublic information of our collaborators, licensors, suppliers and customers responsibly and in accordance with our agreements with them, including information regarding their technology and product pipelines.

58.     With respect to "Company Records," the Code of Ethics states, in relevant part:

All Company records must be complete, accurate and reliable in all material respects. Each employee and director must follow any formal document retention policy of the Company with respect to Company records within such employee's or director's control. Please contact your supervisor or the Company's Chief Legal Officer to obtain a copy of any such policy or with any questions concerning any such policy.

59.     In a section titled "Accuracy of Financial Reports and Other Public Communications," the Code of Ethics provides:

As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

The Company's principal financial officers and other employees working in the Company's finance department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

60.     In a section titled "Compliance with Laws and Regulations," the Code of Ethics provides, in relevant part:

Each employee and director has an obligation to comply with all laws, rules and regulations applicable to the Company's operations. These include, without limitation, laws covering bribery and kickbacks, sanctions and trade controls, the development, testing, approval, manufacture, marketing and sale of our products and product candidates, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions,

16

foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. You are expected to understand and comply with all laws, rules and regulations that apply to your job position. If any doubt exists about whether a course of action is lawful, you should seek advice from your supervisor or the Company's Chief Legal Officer.

*                    *                    *

### E. Compliance with Insider Trading Laws

Consistent with the Company's Insider Trading Compliance Policy, the Company's employees and directors are prohibited from trading in the stock or other securities of the Company while in possession of material nonpublic information about the Company. In addition, Company employees and directors are prohibited from recommending, "tipping" or suggesting that anyone else buy or sell the Company's stock or other securities on the basis of material non-public information. Employees and directors who obtain material non-public information about another company in the course of their duties are prohibited from trading in the stock or securities of the other company while in possession of such information or "tipping" others to trade on the basis of such information. Violation of insider trading laws can result in severe fines and criminal penalties, as well as disciplinary action by the Company, up to and including, for an employee, termination of employment or, for a director, a request that such director resign from the Board of Directors. You are required to read carefully and observe our Insider Trading Compliance Policy, as amended from time to time. Please contact the Company's Chief Financial Officer for a copy of the Insider Trading Compliance Policy or with any questions you may have about insider trading laws.

61.     In a section titled "Public Communications and Regulation FD," the Code of Ethics

provides:

### A. Public Communications Generally

The Company places a high value on its credibility and reputation in the community. What is written or said about the Company in the news media and investment community directly impacts our reputation, positively or negatively. Our policy is to provide timely, accurate and complete information in response to public requests (from media, analysts, etc.), consistent with our obligations to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market sensitive financial data. The Company has adopted a separate Policy Statement – Guidelines for Corporate Disclosure to maintain the Company's credibility and reputation in the community, to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market sensitive financial data.

17

B. Compliance with Regulation FD

In connection with its public communications, the Company is required to comply with a rule under the federal securities laws referred to as Regulation FD (which stands for "fair disclosure"). Regulation FD provides that, when we disclose material non-public information about the Company to securities market professionals or the Company's stockholders (where it is reasonably foreseeable that the stockholders will trade on the information), we must also disclose the information to the public. "Securities market professionals" generally include analysts, institutional investors and other investment advisors.

The Company has designated certain individuals as "spokespersons" who are responsible for communicating with analysts, institutional investors and representatives of the media. Any employee or director who is not a designated spokesperson of the Company may not communicate any information about the Company to analysts, institutional investors, other stockholders or representatives of the media, except at the request of the Company's designated spokespersons.

For more information on the Company's policies and procedures regarding public communications and Regulation FD, please contact the Company's Chief Legal Officer or Chief Financial Officer for a copy of the Company's Policy Statement – Guidelines for Corporate Disclosure or with any questions you may have about disclosure matters.

62.     The Company's Corporate Governance Guidelines, meanwhile, were adopted "to assist the Board in the exercise of its responsibilities and to serve the interests of the Company and its stockholders."

63.     With respect to director responsibilities, the Corporate Governance Guidelines state:

The business and affairs of the Company will be managed by or under the direction of the Board, including through one or more of its committees as set forth in the Company's bylaws and committee charters. Each director is expected to spend the time and effort necessary to properly discharge his or her responsibilities. These include:

- exercising their business judgment in good faith;
- acting in what they reasonably believe to be the best interest of its stockholders;
- becoming and remaining well-informed about the Company's business and operations and general business and economic trends affecting the Company; and

- ensuring that the business of the Company is conducted so as to further the long-term interests of its stockholders.

64.      In a section titled "Risk Management," the Corporate Governance Guidelines provide:

> As provided in the Audit Committee Charter, the Audit Committee is responsible for reviewing and discussing, and periodically reporting to the Board with respect to, the Company's policies, programs and practices with respect to risk assessment and risk management, including guidelines and policies to govern the process by which the Company's exposure to risk is handled. In accordance with those policies, programs and practices, the Board and the Board committees shall have an active role in overseeing management of the Company's risks. The Board shall regularly review information regarding the Company's credit, liquidity and operations, as well as the risks associated with each. The [sic] In addition, the Board shall receive regular briefings from senior management, no less than annually, on information security matters, including data privacy and cybersecurity. The Board shall also receive from management and/or advisors, at least annually, updates on ESG rules and requirements applicable to the Company and practices of similarly situated companies. The Company's Compensation Committee shall be responsible for overseeing the management of risks relating to the Company's executive compensation plans and arrangements. The Company's Audit Committee shall oversee management of financial and information risks and other material risks facing the Company. The Nominating and Corporate Governance Committee shall manage risks associated with the independence of the Board and potential conflicts of interest. While each committee shall be responsible for evaluating certain risks and overseeing the management of such risks, the entire Board is regularly informed through committee reports about such risks.

## BIOXCEL'S AUDIT COMMITTEE CHARTER

65.      BioXcel's Audit Committee Charter states that the purpose of the Audit Committee "is to, among other things, assist the Board's oversight of the Company's accounting and financial reporting processes and the audits of the Company's financial statements."

66.      In a section detailing the Audit Committee's authority and responsibilities, the Audit Committee Charter provides, in relevant part:

*Audited Financial Statements*

7.      <u>Review and Discussion of Financial Statements</u>.   The Committee shall review and discuss with the Company's management and independent auditor the

Company's financial statements prior to their public disclosure, including the matters required to be discussed by applicable PCAOB standards and SEC rules.

8.  <u>Recommendation to Board Regarding Audited Financial Statements</u>.  The Committee shall consider whether it will recommend to the Board that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K to be filed with the SEC.

9.  <u>Audit Committee Report</u>.  The Committee shall prepare an annual committee report for inclusion where necessary in the proxy statement of the Company relating to its annual meeting of stockholders.

***Review of Other Financial Disclosures***

10.  <u>Independent Auditor Review of Interim Financial Statements</u>.  The Committee shall direct the independent auditor to use its best efforts to perform all reviews of interim financial information prior to disclosure by the Company of such information and to discuss promptly with the Committee and the Chief Financial Officer any matters identified in connection with the auditor's review of interim financial information which are required to be discussed by applicable auditing standards. The Committee shall direct management to advise the Committee in the event that the Company proposes to disclose interim financial information prior to completion of the independent auditor's review of interim financial information.

11.  <u>Review and Discussion of Earnings Releases</u>. The Committee is expected to review and discuss the Company's earnings press releases, including whether the Company will issue a preliminary earnings release and, if approved, determine the financial or business information to be included in such preliminary earnings release.

67.  With respect to the Audit Committee's authority and responsibility concerning

"Controls and Procedures," the Audit Committee Charter states, in relevant part:

12.  <u>Oversight</u>.  The Committee shall coordinate the Board's oversight of the Company's internal control over financial reporting, disclosure controls and procedures and code of conduct.

13.  <u>Risk Management</u>.  The Committee shall discuss the Company's policies with respect to risk assessment and risk management, including guidelines and policies to govern the process by which the Company's exposure to risk is handled, and oversee management of the Company's financial risks, cybersecurity risks, information security risks, and, as necessary or advisable, such other material risks facing the Company.

14.  <u>Procedures for Complaints</u>.  The Committee shall establish procedures for (i)

20

the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters; and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

15.    Oversight of Related Person Transactions.  The Committee is responsible for reviewing and approving or ratifying "related person transactions" in accordance with the Company's Related Person Transaction Policy and Procedures.

                    *                    *                    *

17.    Additional Duties.  In addition to the duties and responsibilities expressly delegated to the Committee in this Charter, the Committee may exercise any other powers and carry out any other responsibilities consistent with this Charter, the purposes of the Committee, the Company's organizational documents and applicable Nasdaq rules.

## SUBSTANTIVE ALLEGATIONS

### *Background*

68.    BioXcel is a clinical stage biopharmaceutical company incorporated in Delaware. The Company purports to "leverage[] existing approved drugs and/or clinically evaluated product candidates together with big data and proprietary machine learning algorithms to identify new therapeutic indications."

69.    The Company employs artificial intelligence in the drug development process to find new uses for drugs that are, or have previously been in, Phase II or Phase III clinical trials.

70.    The company's lead asset is BXCL501. BioXcel touted BXCL501 as one of its two most advanced clinical development programs at the Company. The other advanced clinical development, a potential oncology therapy compound known as BCXL701, was far behind BXCL501 in clinical trials and commercial development.

71.    The FDA approved BioXcel's first indication of BXCL501, branded as IGALMI, for the treatment of agitation in schizophrenia and bipolar patients on April 5, 2022.

72.    From December 5, 2022 through December 21, 2022, the FDA conducted an

inspection of the TRANQUILITY North Miami trial site to review its compliance with promulgated clinical testing criteria on several levels.

73.     Following the inspection, the FDA issued the Form 483 Letter to BioXcel noting violations including that:

- 25 of 37 patients did not have sufficient documentation showing they met all inclusion criteria. Three of these patients' files demonstrated they potentially met exclusion criteria of having memory impairment or cognitive impairment unrelated to Alzheimer's Disease.

- The clinical trial was not being conducted in accordance with the approved protocol in certain instances.

- At least one Serious Adverse Event occurred that was not timely reported to the medical monitor or safety team.

- Certain study participants did not sign a proper consent form which meant they might have to be excluded from the study, resulting in insufficient participation.

74.      The findings detailed in the Form 483 Letter represented serious violations and causes for concern. For instance, without sufficient documentation, there is no way to verify that the study participants were in fact the proper subjects of the study. Further, the FDA investigator found that "[t]hree of these subjects' files contained documentation they potentially met exclusion criteria of having memory impairment or worsening of cognitive function unrelated to probable Alzheimer's Disease." Inclusion of such patients in the study not only jeopardized the study's results, but could mean the study did not have sufficient participants to draw any meaningful conclusions.

75.     Moreover, Serious Adverse Events are defined as an untoward medical occurrence in a subject that is fatal, life-threatening, or can result in hospitalization. Though study administrators are required to report such events within 24 hours, the FDA found that Dr. Meyer had failed to report at least one Serious Adverse Event on at least one occasion. Even more

troubling, the Company reported that in May 2023, it had discovered that Dr. Meyer had fabricated email correspondence in order to make it appear as though she had timely reported another Serious Adverse Event, separate and apart from the one cited in the Form 483 Letter.

76.     Typically, when a study sponsor engages a principal investigator, there is a contract in place that states that the study sponsor must be notified directly and promptly when a Form 483 Letter is issued. Once a Form 483 letter is issued, the sponsor of the study is required to participate in any corrective actions alongside the principal investigator. As such, BioXcel would have been immediately notified of the 483 Letter.

77.     Further, several confidential witnesses who worked at the Company and were interviewed in the Securities Action confirmed, among other things, that: (1) Dr. Meyer had never previously been in charge of a clinical trial; (2) one of BioXcel's two primary investors "had, for the end of 2023, significant milestones that needed to be met, both for commercial sales and clinical studies[,]" and "if not completed, either new funding wouldn't be available or, potentially, the company would have to kick back some money"; (3) Company executives "thought it was going to be faster, doing it at Segal"; (4) BioXcel would have been in regular communication with the FDA, even before the study began; (5) Defendant Risinger made "all the development decisions … on a microscopic level"; and (6) Defendant Mehta was personally "involved" in choosing sites and vendors for clinical operations.

***Materially False and Misleading Statements***

78.     At the start of the Relevant Period, on December 7, 2022, during a presentation at the Bank of America 2022 Virtual Biotech SMID Cap Conference, Defendant Mehta told investors "TRANQUILITY 2 is in advanced stages of enrollment, ***and it's progressing well*** and we expect that data readout again in first half of 2023. So we have 2 pivotal data readouts in first half of

2023."[1]

79.     The statement that TRANQUILITY 2 was "progressing well" was materially false when made. In fact, the FDA had already initiated its investigation into the North Miami facility, which comprised 40% of the TRANQUILITY II study and was being overseen by Dr. Meyer who was an inexperienced principal investigator employed by a disreputable clinical trial company. Consequently, although the study was in "advanced stages of enrollment," BioXcel faced a serious risk of adverse regulatory action that would invalidate the TRANQUILITY II data.

80.     On January 11, 2023, during the 41st Annual J.P. Morgan Healthcare Conference, Defendants presented a PowerPoint that stated the "Phase 3 TRANQUILITY II Pivotal Trial" was "on Track in 1H 2023." The presentation also represented that the "TRANQUILITY II Trial" had "Progressed" on a "Strong Foundation".

81.     During the same conference, Defendant Mehta went on to discuss Alzheimer's Disease-related agitation and tout the TRANQUILITY II trial. Mehta stated, "[i]n addition, almost 100 million episodes in Alzheimer's-related agitation. There is no current approved therapy. Anything that is used to manage agitation has a black box warning. Like antipsychotics, benzodiazepine, we have a completely novel mechanism. It, we believe, target the causal mechanism of agitation. *So we are very excited about TRANQUILITY II data*. That is expected again in first half of 2023. So we have 2 pivotal data readouts in first half of 2023."

82.     The statements made at the January 11, 2023 J.P. Morgan Healthcare Conference were materially false and misleading when made, and omitted material adverse facts about the Company's business, the success of the TRANQUILTIY II trial and the Form 483 Letter. In reality,

---

[1] All emphases added unless otherwise indicated.

the Form 483 Letter listed several serious protocol violations requiring immediate corrective action, which demonstrated that the TRANQUILITY II study was neither "on Track in 1H 2023" nor on a "Strong Foundation."

83.    On February 21, 2023, BioXcel held its first BXCL501 Key Opinion Leader Day event, during which Defendant Mehta stated, in relevant part:

> And I'm very pleased to stand here and see that we have an approved drug in our neuroscience franchise. And now we have achieved human proof of concept with our immune-oncology asset, which is BXCL701. Today, for the first time, all focus is going to be on that. I know most of the time we talk about the neuroscience business. So just to give highlight our first drug, IGALMI got approved in about 3.5 years from first in-human all the way to the NDA approval, and it has been launched within a 4-year window. There are multiple opportunities to expand the market potential for this product, and we have upcoming 3 data readouts. One is Alzheimer's-related agitation, TRANQUILITY II; SERENITY III, which is for at-home use. And third is our MDD. So all 3 data readouts are on track, and we are excited to announce that in first half of 2023.

84.    The statements made at the February 21, 2023, Key Opinion Leader Day event were materially false and misleading when made, and omitted material adverse facts about the Company's business, the success of the TRANQUILTIY II trial and the Form 483 Letter. The statements above did not disclose that Defendants had received the Form 483 Letter listing several serious protocol violations requiring immediate corrective action, such that BioXcel's clinical trial and commercialization plans would be delayed significantly. As a result of the FDA investigation and Form 483 Letter, the Company faced material risks that the trial data would be considered invalid or inaccurate, that commercialization of BXCL501 would be delayed or abandoned, and that the Company would miss regulatory milestones required by its financing agreements with Oaktree and QIA, threatening its financial position.

85.    March 9, 2023, Defendants held an earnings conference call to discuss BioXcel's financial results for the fourth quarter of 2022. During the earnings call, Defendant Mehta stated,

in relevant part:

> [T]urning to our robust clinical pipeline; we believe the upcoming quarter may represent a watershed moment for the company. In the second quarter, we expect to announce pivotal clinical data that potentially supports significant market expansion opportunities for our lead neuropsychiatric program, BXCL501. We believe this agitation market remains under-diagnosed and underserved. It is comprised of an estimated 139 million agitation episodes per year across bipolar disorder, schizophrenia and Alzheimer's; our 3 priority indications across various medical settings.

> Specifically, we expect to announce data from 2 Phase III pivotal studies for 501 in the second quarter. These studies include TRANQUILITY II trial and SERENITY III trials. Our TRANQUILITY program is designed to evaluate 501 for the acute treatment of Alzheimer's-related agitation; up to 100 million agitation episodes are estimated to occur annually in this patient population in the U.S. where currently, there are no approved FDA therapies. The TRANQUILITY II trial is fully enrolled and then – and the data cleaning and verification process has begun.

86.     Also during the call, Defendant Steinhart discussed the Company's "cash" providing, in pertinent part, "Cash and cash equivalents totaled $193.7 million at December 31, 2022, compared to $233 million at December 31, 2021. The company believes that full execution of our strategic financing with Oaktree and the Qatar Investment Authority **would result in a cash runway into 2025**."

87.     In response to an analyst question concerning "a typical timeline for data verification and cleaning" for the trial, Defendant Risinger responded:

> So realize this is – although it's a quick trial, it's a 3 months duration for any particular patient. And so there's a range of dosing for patients, some doses or some patients may have only had a couple of doses, other have had many, and we have to do what's called source data verification. So we literally check the numbers that are entered in our database against what's in the clinical medical records. That's actually a lot of work. So it's anywhere from 8 to 10 weeks of literally daily work by many people **to make sure our data is accurate, correct and precise**.

88.     The statements made on the March 9, 2023, earnings call were materially false and misleading when made, and omitted material adverse facts about the Company's business, the success and progress of the TRANQUILTIY II trial, and the Form 483 Letter. As a result of the

FDA investigation and Form 483 Letter, the Company faced material risks that the trial data would be considered invalid or inaccurate, that commercialization of BXCL501 would be delayed or abandoned, and that the Company would miss regulatory milestones required by its financing agreements with Oaktree and QIA threatening its financial position. Furthermore, the data from the TRANQUILITY II study was not "accurate, correct and precise[,]" but rather was in serious jeopardy of being noncompliant with regulations and protocols, while deficiencies in the study undermined the accuracy and precision of all the data it generated.

89.     On March 16, 2023, BioXcel filed its annual report on Form 10-K with the SEC (the "2022 10-K") for the period ended on December 31, 2022. Defendants Mehta, Mueller, Bray, Laumas, Miller, Nandabalan, and Steinhart signed the 2022 10-K. The 2022 10-K disclosed that BioXcel relied on third parties to conduct its trials while at the same time concealing that its primary investigator for 40% of the TRANQUILITY II patients had violated study protocols and that BioXcel had received the Form 483 as a result. Specifically, the 2022 10-K stated:

> ***We rely on third parties to conduct our preclinical and clinical trials. If these third parties do not successfully perform their contractual legal and regulatory duties or meet expected deadlines, we may not be able to obtain regulatory approval for or commercialize our product candidates and our business could be substantially harmed.***
>
> We have relied upon and plan to continue to rely upon third-party medical institutions, clinical investigators, contract laboratories and other third-party CROs to monitor and manage data for our ongoing preclinical and clinical programs. We rely on these parties for execution of our preclinical and clinical trials, and control only certain aspects of their activities. Nevertheless, we are responsible for ensuring that each of our studies is conducted in accordance with the applicable protocol, legal, regulatory and scientific standards, and our reliance on the CROs does not relieve us of our regulatory responsibilities. We and our CROs are required to comply with GCPs, which are regulations and guidelines enforced by the FDA, the Competent Authorities of the member states of the EEA and comparable foreign regulatory authorities for all of our products in clinical development.
>
> Regulatory authorities enforce these GCPs through periodic inspections of trial sponsors, principal investigators and trial sites. ***If we or any of our CROs fail to***

***comply with applicable GCPs, the clinical data generated in our clinical trials may be deemed unreliable and the FDA, the EMA or comparable foreign regulatory authorities may require us to perform additional clinical trials before approving our marketing applications***. We cannot assure you that upon inspection by a given regulatory authority, such regulatory authority will determine that any of our clinical trials comply with GCP regulations. In addition, our clinical trials must be conducted with product produced under cGMP regulations. Our failure to comply with these regulations may require us to repeat clinical trials, which would delay the regulatory approval process.

If any of our relationships with these third-party CROs terminate, we may not be able to enter into arrangements with alternative CROs or to do so on commercially reasonable terms. In addition, our CROs are not our employees, and except for remedies available to us under our agreements with such CROs, we cannot control whether or not they devote sufficient time and resources to our on-going clinical, nonclinical and preclinical programs. If CROs do not successfully carry out their contractual duties or obligations or meet expected deadlines, if they need to be replaced or if the quality or accuracy of the clinical data they obtain is compromised due to the failure to adhere to our clinical protocols, regulatory requirements or for other reasons, our clinical trials may be extended, delayed or terminated and we may not be able to obtain regulatory approval for or successfully commercialize our product candidates. As a result, our results of operations and the commercial prospects for our product candidates would be harmed, our costs could increase and our ability to generate revenues could be delayed.

90.     Furthermore, the 2022 10-K disclosed that: "We expect that our cash and cash equivalents as of December 31, 2022 will be sufficient to fund our ongoing research and development efforts and commercialization efforts for at least twelve months from the date of the issuance of the consolidated financial statements included in this Annual Report on Form 10-K."

91.     The statements identified above in the 2022 10-K were materially false and misleading when made, and omitted material adverse facts about the Company's business, the success and progress of the TRANQUILTIY II trial, and the Form 483 Letter. Though presented as hypothetical risks that "if [the Company] or any of [its] CROs fail to comply with applicable GCPs, the clinical data generated in our clinical trials ***may be deemed unreliable***[,]" Defendants knew that that there were issues in the North Miami TRANQUILITY II trial site and, in fact, its key principal investigator had already failed to comply with regulations. Further, the Form 483

Letter affected Defendants' ability to meet regulatory milestones required by the Company's financing agreements with Oaktree and QIA. Defendants, therefore, had reason to believe that the Company would not be able to extend its cash runway into 2025.

92.     On May 8, 2023, the Company hosted an earnings call with analysts and investors to discuss first quarter 2023 results. During the call, Defendant Mehta stated: "On the clinical front, we are very excited for 3 key data readouts across our lead neuropsychiatric program, BXCL501. These data readouts are on track and expected to enable significant potential market expansion . . . . Up to an estimated 100 million agitation episodes occur annually in the U.S., our TRANQUILITY II program continues to advance, and we are on track to report top line data in June."

93.     On the same call, Defendant Steinhart added:

Net revenue was approximately $206,000 for the quarter, similar to our prior quarter. We expect to see a notable uptick in revenue in the second half of the year as we believe we will continue to accrue more formulary approvals. Research and development expenses were $27.8 million for the first quarter of 2023 compared to $18.6 million for the same period in 2022. The increased expenses were primarily attributable to multiple clinical trials and CMC costs related to our upcoming 3 data readouts. Sales, general and administrative expenses were $23.6 million for the first quarter of 2023 as compared to $12.9 million for the same period in 2022. The increased expenses were primarily attributable to personnel, sales, market access and marketing costs associated with the commercialization of IGALMI in the United States. BioXcel Therapeutics had a net loss of $52.8 million for the first quarter of 2023 compared to a net loss of $31.5 million in the same period of 2022. Cash and cash equivalents totaled $165.5 million as of March 31, 2023. We believe that full execution of our strategic financing with Oaktree and Qatar Investment Authority and IGALMI revenues will result in a cash runway into 2025.

94.     The statements identified above made during the May 8, 2023, earnings call were materially false and misleading when made, and omitted material adverse facts about the Company's business, the success and progress of the TRANQUILTIY II trial, and the Form 483 Letter. Defendants had received notice of the Form 483 Letter nearly five months earlier and were

aware of the numerous deficiencies and violations associated with the portion of the TRANQUILITY II trial at the North Miami site. The Form 483 Letter had also materially and negatively impacted BioXcel's "market expansion" efforts given the delay that the Form 483 Letter would have on the Company's clinical trial. Further, Defendant Steinhart's statements concerning the Company's financials misleadingly failed to disclose the Form 483 Letter, which would jeopardize, if not completely prevent, BioXcel from achieving "full execution" of its required milestones under its financing agreement with Oaktree and QIA.

95.      On May 9, 2023, during a presentation at the Bank of America Global Healthcare Conference, an analyst from Bank of America Securities, Research Division asked: "… And then the other one that's a big focus among investors is TRANQUILITY II in Alzheimer's agitation. What should we be looking for in this update and in this setting?" Defendant Risinger responded: "That trial is completed. The last patient has completed. The data is being locked and undergoing verification. That trial was powered based on TRANQUILITY I, which showed efficacy not only for the primary measure, the same primary measure for TRANQUILITY II, but it also separated statistically on each and every secondary or confirmatory measure, the modified Cohen-Mansfield index, agitation-calmness evaluation scale, and both CGI improvement and severity. We have very high confidence in demonstrating not only efficacy, but also the safety in patients living in an assisted living or residential care setting."

96.      In response to a follow-up question concerning the bar for successful efficacy, Defendant Risinger responded:

> Well, it's, again, the FDA has given us breakthrough therapy precisely because this is an innovative approach. We're dosing patients only when they need it, when they have an acute episode of agitation. And so of course, in the elderly, safety is critical. We're demonstrating in this study whether or not it's safe. ***From what we've seen so far, we're confident that we'll be able to take this package.*** In terms of efficacy,

we simply have to demonstrate what we've already demonstrated in TRANQUILITY I.

97.     Defendant Risinger's statements identified above were materially false and misleading when made, and omitted material adverse facts, as any "confidence" that Risinger or BioXcel had about "demonstrating" the efficacy and safety of BXCL501 for Alzheimer's Disease and dementia patients was undermined by the issues outlined in the Form 483 Letter, which was not disclosed.

98.     May 9, 2023, BioXcel filed its Quarterly Report with the SEC on Form 10-Q for the first quarter ended March 31, 2023 (the "1Q22 10-Q"). Defendants Mehta and Steinhart signed the 1Q22 10-Q. In the 1Q22 10-Q, the Company disclosed that it "believe[d] that its existing cash and cash equivalents will be sufficient to cover its cash flow requirements for at least the next 12 months from the issuance date of these condensed consolidated financial statements."

99.     The statement identified above in the 1Q22 10-Q was materially false and misleading when made, and omitted material adverse facts, as it failed to disclose the existence of the Form 483 Letter jeopardizing the Company's ability to meet regulatory milestones required by the Company's financing agreements with Oaktree and QIA. Defendants had reason to believe that the Company would not be able to extend its cash runway into 2025.

100.     On May 17, 2023, BioXcel issued the 2023 Proxy Statement for the 2023 Annual Meeting of Shareholders, to be held on June 26, 2023. Among other things, the 2023 Proxy Statement solicited shareholders to vote for Defendants Laumas, Miller, and Votruba for reelection to the Board. The 2023 Proxy stated that the Board believed each of the nominees "display personal and professional integrity; satisfactory levels of education and/or business experience; broad-based business acumen; an appropriate level of understanding of our business and its industry and other industries relevant to our business; the ability and willingness to devote adequate time to the work

of our Board of Directors and its committees; skills and personality that complement those of our other directors that helps build a board that is effective, collegial and responsive to the needs of our Company; strategic thinking and a willingness to share ideas; a diversity of experiences, expertise and background; and the ability to represent the interests of all of our stockholders." The 2023 Proxy Statement failed to disclose that the Company lacked adequate internal controls over study protocol adherence and data integrity.

101.    On May 25, 2023, the Company held a Special Call for investors to discuss topline results for BioXcel's SERENITY III clinical trial. During the call, Defendant Mehta provided, in relevant part:

> Beyond SERENITY III, we are very excited about BXCL501's recent and upcoming data readout, which we believe showcases its pipeline within a product potential. These include the positive top line data we announced for the major depressive disorder program last week, and our TRANQUILITY II trial examining 501 in Alzheimer's-related agitation expected in June. As a reminder, our Alzheimer's-related agitation program is evaluating 40- and 60-microgram doses of BXCL501 in TRANQUILITY II and III.

> In elderly patient, the exposure levels of the 60-microgram dose are almost double and equivalent to the 120-microgram dose in adults. Additionally, the 60-microgram dose met all 5 efficacy endpoints in the TRANQUILITY I study. *We are confident in the TRANQUILITY II design and plan*. These catalysts support BXCL501 potential in multiple neuropsychiatric conditions of significant unmet medical need and reinforce the breadth and depth of our innovative neuroscience portfolio.

102.    Defendant Mehta's statement identified above on the May 25, 2023 Special Call was materially false and misleading when made because, contrary to Mehta's statement that he was "confident" in the study's design and plan, the Form 483 Letter outlined specific material risks that commercialization of BXCL501 would be delayed or abandoned, which remained undisclosed to the investing public.

103.    On June 8, 2023, during a presentation at the Jefferies Healthcare Conference, an

analyst from Jefferies Group LLC asked Mehta: "Okay. All right. Well, let's say, Vimal, we're going to get those stupendous data at the end of this month. Can you file an SNDA right after that? Or, I guess, what would be the regulatory expectations after that?" Defendant Mehta responded, "So that's a great question. *It depends on the data*. How well is efficacy data as well as safety. And if you think about the need for these patients, 100 million episodes, even if it's half of the market and half of them are in nursing home or who are more frequent agitation, which we are doing capturing In TRANQUILITY II. We will have a conversation with the FDA, ask them what do we need to file the SNDA, and then fill those gaps and file it. *If they allow us to file it with TRANQUILITY II, we'll be ready to go, basically, if we don't need to generate anything*."

104.     On June 14, 2023, during the Goldman Sachs Healthcare conference, Defendant Risinger told investors that BioXcel had "*a lot of confidence in being able to demonstrate both efficacy and safety*" through the TRANQUILITY II trials.

105.     The statements identified above made at the Jeffries Healthcare Conference and Goldman Sachs Healthcare Conference were materially false and misleading when made. Specifically, Defendant Mehta's statement that regulatory expectations "depend[ed] on the data" ignored the existence of the Form 483 Letter and the issues with the study that it detailed. In fact, the integrity of the data from the TANQUILITY II trials was seriously compromised for the reasons explained in the Form 483 Letter.

***The Truth Emerges***

106.     On June 29, 2023, the Company filed a Current Report on Form 8-K with the SEC disclosing, in relevant part:

> In December 2022, the U.S. Food and Drug Administration ("FDA") conducted an inspection of one of the clinical trial sites in the Phase 3 TRANQUILITY II clinical trial, where the principal investigator enrolled approximately 40% of the subjects

participating in the trial. At the conclusion of this inspection, the FDA issued an FDA Form 483 identifying three inspectional observations. These observations related to *the principal investigator's failure to adhere to the informed consent form approved by the Institutional Review Board for a limited number of subjects whose records the FDA reviewed, maintain adequate case histories for certain patients whose records the FDA reviewed, and adhere to the investigational plan in certain instances. For example, the FDA cited the principal investigator's delay in informing the sponsor's medical monitor or pharmacovigilance safety vendor of a serious adverse event ("SAE") for one of the subjects, which report was made to the Company's vendor outside of the 24 hour time period prescribed by the clinical trial protocol*. The principal investigator for this clinical site responded to the FDA observations within the time period requested. The FDA inspection remains open, however, as the FDA has not issued an Establishment Inspection Report.

In May 2023, it came to the Company's attention that *this same principal investigator in the TRANQUILITY II clinical trial may have fabricated email correspondence purporting to demonstrate that the investigator timely submitted to the Company's pharmacovigilance safety vendor a report of an SAE from a different subject than the one cited in the FDA Form 483, and purporting to show that the vendor had confirmed receipt*. Upon receipt of this information, the Company promptly initiated an investigation and recently received confirmation that the principal investigator fabricated the email correspondence related to the timing of the reporting of this SAE to the Company's pharmacovigilance vendor to make it appear as though this SAE had been timely reported to the pharmacovigilance vendor as required by the clinical trial protocol. The Company also confirmed that this SAE had been timely entered into the electronic data capture system, even though the SAE had not been separately reported to the Company's pharmacovigilance safety vendor within the 24 hour timeframe required under the protocol.

In connection with this ongoing investigation, the Company was made aware that *the fabricated email correspondence was provided to the FDA by the principal investigator's employer during the on-site inspection in December 2022*. After unblinding of the data, the Company determined that the SAE that was the subject of this fabricated correspondence between the principal investigator and the Company's pharmacovigilance vendor occurred in a subject in the placebo arm. This principal investigator has not participated in any other clinical trial sponsored or conducted by the Company. Moreover, the study was designed such that trained study staff other than principal investigators were to conduct assessments of the primary efficacy measure.

*The Company is currently in the process of conducting an investigation into protocol adherence and data integrity at the principal investigator's trial site* and is in the process of retaining an independent third party to audit the data collected at the site. The Company's ongoing investigation and/or the planned independent

audit may uncover new findings regarding the integrity of the trial data from this principal investigator's site, the accuracy of safety or efficacy findings, or the usability of the data in connection with a marketing application. The Company plans to complete its investigation as soon as possible, although the Company can provide no assurance regarding the timing of the completion of its own investigation or the timing of the completion of the planned independent audit of the trial site. Further, ***the Company has notified the FDA of these findings*** and the steps it intends to take to validate the integrity of the data generated by this investigator for the TRANQUILITY II trial.

107.    Furthermore, the Company disclosed that it was providing the below supplemental risk factor:

> ***Developments relating to the Company's TRANQUILITY II Phase 3 trial may impact the timing of the Company's development plans for, and prospects for regulatory approval of, BXCL501 for the acute treatment of agitation associated with dementia in patients with probable Alzheimer's disease.***
>
> The timing of the Company's marketing application and prospects for regulatory approval of BXCL501 for the acute treatment of agitation associated with dementia in patients with probable Alzheimer's disease may be adversely impacted by these developments. For example, even if the Company's investigation and the independent audit conclude that data from the TRANQUILITY II trial have not been affected or compromised by the principal investigator's actions or other deficiencies at the trial site, the FDA may not accept or agree with the Company's conclusions or analyses, or may interpret or weigh their importance differently. Further, if the Company or the FDA determines that there are issues with data integrity and/or compliance with good clinical practice requirements at the trial site, the Company may be unable to use some or all of the subject data generated at this clinical site to support a marketing application. If all or a substantial portion of such data were discarded, the TRANQUILITY II trial may no longer be adequately powered for statistical significance and the Company may need to conduct a new clinical trial. If the Company conducts a new Phase 3 trial, such trial may have different safety or efficacy results from the topline data the Company is announcing today. Topline data from the TRANQUILITY II trial, including results from subjects at this principal investigator's site, may not be predictive of the results in any new trial. Further, any investigation, disqualification or debarment of, or proceeding or action against the principal investigator, or any investigation, proceeding or action against the Company, could further delay development and approval of BXCL501 for this indication, and otherwise have a material adverse effect on the Company, its financial condition, results of operations and prospects.

108.    Additionally, Defendant Risinger admitted that the Company knew of the FDA investigation since December 2022. On a call with analysts and investors, Defendant Risinger

disclosed, "The FDA did the audit back in December. ***We were aware of it***, and we've been monitoring that site even more closely."

109.    On this news, the price of BioXcel common stock dropped 63.8%, or $11.28 per share, to close at $6.39 per share on June 29, 2023.

110.    On August 14, 2023, BioXcel announced results from the second quarter 2023 and disclosed a restructuring to extend cash runway and the pausing of the TRANQUILITY III trial after observing agitation episodes in study participants. It also announced doubts about its ability to continue as a going concern.

111.    Specifically, the Company disclosed:

The Company's history of significant losses, its negative cash flows from operations, potential near-term, increased covenant-driven payments under its OFA Facilities (as defined in Note 8, Debt and Credit Facilities), its limited liquidity resources currently on hand, and its dependence on its ability to obtain additional financing to fund its operations after the current resources are exhausted, about which there can be no certainty, have resulted in management's assessment that there is substantial doubt about the Company's ability to continue as a going concern for a period of at least 12 months from the issuance date of the financial statements included in this Quarterly Report on Form 10-Q.

112.    Also on August 14, 2023, during an earnings call with analysts and investors, Defendant Steinhart stated:

The Company's previously disclosed cash runway projection assumed a full utilization of its strategic financing agreements of $155 million with Oaktree Fund Administration and Qatar Investment Authority. Based on recent events, the Company is not likely to be in a position to meet the milestones required to access the additional capital under the financing agreements. The Company is exploring multiple ways to extend its cash runway and is already in discussions with its strategic financing partners to amend the agreements. Successful modification of these agreements could extend the company's cash runway.

113.    Defendant Mehta also announced a "commercial reorganization" which would involve reducing the workforce from 190 to 80 employees. The remaining employees would focus on building "potential label expansions" and "support[ing] IGALMI."

114.    With respect to TRANQUILITY III, Defendant Mehta announced: "we paused enrollment after early trial data showed a much higher background frequency of agitation episode than originally expected." He further announced that the Company had "requested a meeting with the FDA to discuss [its] entire TRANQUILITY program. This will include both TRANQUILITY II, TRANQUILITY III clinical trials, the data audit and the data package that may be required to support submission of an sNDA seeking approval of 501 for the acute treatment of agitation in mild to moderate dementia patients with probable Alzheimer's disease. We hope to have an update on the TRANQUILITY program, including the audit and FDA meeting by the end of the year."

115.    On this news, BioXcel's stock price dropped from $7.40 per share on August 11, 2023, to $4.33 per share on August 14, 2023.

***Harm to the Company***

116.    As a direct and proximate result of the Individual Defendants' misconduct, BioXcel has lost and expended, and will lose and expend, millions of dollars.

117.    Such expenditures include, but are not limited to, legal fees associated with the Securities Action filed against the Company, its CEO, CFO, and CMO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

118.    Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the material weaknesses in the Company's internal control over financial reporting.

119.    Such losses also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

120.    As a direct and proximate result of the Individual Defendants' conduct, BioXcel has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

121.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

122.    BioXcel is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

123.    Plaintiff is an owner of BioXcel common stock and has been a continuous shareholder of Company stock throughout the Relevant Period.

124.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

125.    A pre-suit demand on the Board of BioXcel is futile and, therefore, excused. At the time this action was commenced, the six-member Board consisted of Individual Defendants Mehta, Mueller, Bray, Laumas, Miller, and Votruba (the "Director Defendants"). As set forth below, all six Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

126.    The acts complained of herein constitute violations of fiduciary duties owed by BioXcel's officers and directors, and these acts are incapable of ratification.

127.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

128.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

129.    Each of the Director Defendants authorized and/or permitted false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

130.    All six of the Director Defendants signed the 2022 10-K, while Director Defendant Mehta also provided certification in accordance with the Sarbanes-Oxley Act of 2002. Defendant Mehta also signed each of the Company's Quarterly Reports filed with the SEC during the Relevant Period. Accordingly, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

131.    Additionally, the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

132.     Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

133.     Additionally, the Director Defendants took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

134.     Defendants Laumas, Mueller, Miller, and Votruba (the "Audit Defendants") serve or served on the Company's Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

135.     The Director Defendants, as members of the Board, were and are subject to the Company's Codes of Conduct. The Codes of Conduct go well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct. The Director Defendants violated the Codes of Conduct because they knowingly or recklessly participated in making and/or causing the

Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Codes of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

136.    Furthermore, during the Relevant Period, Director Defendants Mehta, Steinhart and Nandabalan (the "Insider Trading Defendants") sold substantial amounts of their personally held BioXcel stock while in the possession of material non-public information. In doing so, they have exposed themselves to criminal liability and heightened civil liability and damages. These insider sales, occurring during the Relevant Period, create a further likelihood of additional significant liability, thus making the Insider Trading Defendants neither disinterested nor independent.

## COUNT I

### Against The Individual Defendants For Violations of § 10(b) of the Exchange Act and Rule 10b-5

137.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

138.    The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

139.    The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

140.    The Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in

light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

141.    The Individual Defendants acted with scienter because they (i) knew that the public documents and statements issued or disseminated in the name of BioXcel were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

142.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of BioXcel, their control over, and/or receipt and/or modification of BioXcel's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning BioXcel, participated in the fraudulent scheme alleged herein.

143.    As a result of the foregoing, the market price of BioXcel common stock was artificially inflated. In ignorance of the falsity of the statements, stockholders relied on the statements described above and/or the integrity of the market price of BioXcel common stock in purchasing BioXcel common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

144.    In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Action and reputational harm.  The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company

to millions of dollars in potential class-wide damages in the Securities Action.

## COUNT II

**Against The Individual Defendants For Violations of Section 14(a) of
The Securities Exchange Act of 1934**

145.    Plaintiff incorporates by reference and realleges each and every allegation set forth
above, as though fully set forth herein.

146.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be
unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce
or of any facility of a national securities exchange or otherwise, in contravention of such rules and
regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the
protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent
or authorization in respect of any security (other than an exempted security) registered pursuant to
section 12 of this title [15 U.S.C. § 78l]."

147.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides
that no proxy statement shall contain "any statement which, at the time and in the light of the
circumstances under which it is made, is false or misleading with respect to any material fact, or
which omits to state any material fact necessary in order to make the statements therein not false
or misleading[.]" 17 C.F.R. § 240.14a-9.

148.    The Company's 2023 Proxy Statement violated Section 14(a) and Rule 14a-9 by
misrepresenting or failing to disclose: (i) that the Company lacked adequate internal controls over
protocol adherence and data integrity; (ii) as a result, the Company was susceptible to breaches of
regulatory processes and procedures imposed by, among others, the FDA; (iii) that the Company
had in fact experienced such breaches when a BioXcel principal investigator failed to adhere to
informed consent forms approved by the institutional review board, failed to maintain proper case

histories for patients whose records were ultimately reviewed by the FDA, and fabricated email correspondence with a safety vendor that was subsequently reviewed by the FDA; (iv) that these breaches would have a negative impact on BioXcel's ability to obtain regulatory approval of BXCL501 for the treatment of agitation associated with Dementia and Alzheimer's Disease; and (v) as a result, the statements made by, or caused to be made by, the Individual Defendants were materially false and/or misleading at all relevant times.

149.   In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose these material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the 2023 Proxy Statement, including but not limited to, election of directors, approval of officer compensation, and appointment of independent auditors.

150.   Plaintiff's allegations with respect to the misleading statements in the 2023 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege and do not sound in fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

151.   As a result of the Individual Defendants' material misrepresentations and omissions in the 2023 Proxy Statement, the Company has sustained significant damages.

## COUNT III

### Against The Individual Defendants
### For Breach Of Fiduciary Duty

152.   Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

153.    The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, candor, loyalty, and due care.

154.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

155.    The Individual Defendants willfully ignored the obvious deficiencies in the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

156.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

157.    Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, inter alia, that: (i) that the Company lacked adequate internal controls over protocol adherence and data integrity; (ii) as a result, the Company was susceptible to breaches of regulatory processes and procedures imposed by, among others, the FDA; (iii) that the Company had in fact

experienced such breaches when a BioXcel principal investigator failed to adhere to informed consent forms approved by the institutional review board, failed to maintain proper case histories for patients whose records were ultimately reviewed by the FDA, and fabricated email correspondence with a safety vendor that was subsequently reviewed by the FDA; (iv) that these breaches would have a negative impact on BioXcel's ability to obtain regulatory approval of BXCL501 for the treatment of agitation associated with dementia and Alzheimer's Disease; and (v) as a result, the statements made by, or caused to be made by, the Individual Defendants were materially false and/or misleading at all relevant times.

158.    The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

159.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

160.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

161.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself

in the Securities Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

162.    Plaintiff, on behalf of BioXcel, has no adequate remedy at law.

## COUNT IV

### Against The Insider Trading Defendants for
### Breach of Fiduciary Duty (*Brophy*)

163.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

164.    BioXcel's Insider Trading Policy expressly provides for a "civil penalty of up to three times the profit gained or loss avoided."

165.    As BioXcel's co-founder, CEO, President, and Board member, Defendant Mehta owed fiduciary duties of loyalty and good faith to the Company and is bound by its Insider Trading Policy. Despite this, Defendant Mehta sold 191,000 shares of his personally held Company stock for proceeds of $3,824,179 during the Relevant Period while in possession of material non-public information.

166.    As BioXcel's Senior Vice President and CFO, Defendant Steinhart owed fiduciary duties of loyalty and good faith to the Company and is bound by its Insider Trading Policy. Despite this, Defendant Steinhart sold 7,084 shares of his personally held Company stock for proceeds of $176,502 during the Relevant Period while in possession of material non-public information.

167.    As BioXcel's co-founder and a member of BioXcel's Board from May 2017 until September 19, 2023, Defendant Nadabalan owed fiduciary duties of loyalty and good faith to the Company and is bound by its Insider Trading Policy. Despite this, Defendant Nandabalan sold 180,000 shares of his personally held Company stock for proceeds of $3,260,076 during the

Relevant Period while in possession of material non-public information.

168.    The Insider Trading Defendants made these stock sales while in possession of inside information that the TRANQUILITY trial was and had been investigated by the FDA, the Form 483 Letter was sent by the FDA, the Form 483 Letter, and the issues detailed within, would seriously jeopardize the validity of the trials and any results, the Form 483 Letter would substantially delay the commercialization of BXCL501 as a therapy for Alzheimer's Disease, the Form 483 Letter would jeopardize the Company's obligations to meet certain milestones to receive loan payments from Oaktree and the QIA, the Form 483 Letter would expose the Company to potential fines, penalties, and lawsuits, and the Company had routinely made false and misleading statements in its financial filings and public statements.

169.    The Insider Trading Defendants knew this was information the market would consider material and that it was virtually certain to harm the Company's stock price and made these sales before disclosing this material information to the public.

170.    By selling their stock while in possession of adverse, material non-public information, Defendants Mehta, Steinhart and Nandabalan exploited their positions, breached their fiduciary duties, and violated the Insider Trading Policy as well as the Company's Codes of Conduct. Because the Insider Trading Defendants sold their stock before the non-public information in their possession could be publicly disclosed and harm the Company's stock price, Defendants Mehta, Steinhart, and Nandabalan improperly benefited from this breach of fiduciary duty and the Company is entitled to damages and the imposition of a constructive trust on any profits obtained thereby.

171.    Plaintiff, on behalf BioXcel, has no adequate remedy at law.

## COUNT V

### Against The Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

172.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

173.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

174.    Plaintiff on behalf of BioXcel has no adequate remedy at law.

## COUNT VI

### Against The Individual Defendants for Unjust Enrichment

175.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

176.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, BioXcel.

177.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from BioXcel that was tied to the performance or artificially inflated valuation of BioXcel or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

178.    Plaintiff, as a shareholder and a representative of BioXcel, seeks restitution from

49

the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and

other compensation procured by the Individual Defendants due to their wrongful conduct and

breach of their fiduciary and contractual duties.

179.    Plaintiff, on behalf of BioXcel, has no adequate remedy at law.

## COUNT VII

### Against The Individual Defendants For Waste Of Corporate Assets

180.    Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

181.    The Individual Defendants breached their fiduciary duties by failing to properly

supervise and monitor the adequacy of the Company's internal controls, by issuing, causing the

issuance of, and/or failing to correct the false and misleading statements identified herein, and by

allowing the Company to engage in an illegal, unethical, and improper course of conduct, which

was continuous, connected, and ongoing at all relevant times.

182.    As a result of the misconduct described above, the Individual Defendants wasted

corporate assets by, *inter alia*: (a) paying and collecting excessive compensation and bonuses; and

(b) incurring potentially millions of dollars of legal liability and/or legal costs, including defending

the Company and its officers against the Securities Action.

183.    As a result of the waste of corporate assets, the Individual Defendants are liable to

the Company.

184.    Plaintiff, on behalf BioXcel, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Declaring that Plaintiff may maintain this derivative action on behalf of BioXcel

and that Plaintiff is a proper and adequate representative of the Company;

B.     Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment;

C.     Directing BioXcel to take all necessary actions to reform and improve its corporate governance and internal procedures to protect BioXcel and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- strengthening the Company's internal reporting and financial disclosure controls;

- developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and

- strengthening the Company's internal operational control functions;

C.     Awarding punitive damages;

D.     Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: January 11, 2023                         **RIGRODSKY LAW, P.A.**

                                        By:   */s/ Seth D. Rigrodsky*
                                              Seth D. Rigrodsky (#3147)
                                              Gina M. Serra (#5387)
                                              Herbert W. Mondros (#3308)
Of Counsel:                                   300 Delaware Avenue, Suite 210
                                              Wilmington, DE 19801
**GRABAR LAW OFFICE**                         Telephone: (302) 295-5310
Joshua H. Grabar, Esq.                        Facsimile: (302) 654-7530
One Liberty Place                             Email: sdr@rl-legal.com
1650 Market Street, Suite 3600                Email: gms@rl-legal.com
Philadelphia, PA 19103                        Email: hwm@rl-legal.com
(267) 507-6085
                                              *Attorneys for Plaintiff*